# In the United States Court of Federal Claims

**No. 08-610C**
**(Filed: June 17, 2011)**

```
* * * * * * * * * * * * * * * * * * * * * * * *
                                    *
TEXTAINER EQUIPMENT               *
MANAGEMENT LIMITED, et al.,       *
                                    *   Fifth Amendment Takings Clause;
            Plaintiffs,           *   Subcontractor Takings Claim; Property
                                    *   Interest Modified by Agreement; Sovereign
v.                                *   Versus Proprietary Capacity; Applicable
                                    *   Interest Rate
THE UNITED STATES,                *
                                    *
            Defendant.            *
                                    *
* * * * * * * * * * * * * * * * * * * * * * * *
```

*Lars H. Liebeler*, Washington, DC, for plaintiffs.

*Patryk J. Drescher*, U.S. Department of Justice, Washington, DC, with whom were *Tony West*, Assistant Attorney General, and *Jeanne E. Davidson*, Director, for defendant. *Major Joseph Krill*, U.S. Army, Arlington, VA, of counsel.

# O P I N I O N

**FIRESTONE**, *Judge*

The plaintiffs in this case claim that the United States Army ("Army" or "government") has taken their property without just compensation in violation of the Fifth Amendment of the Constitution of the United States. Pending before the court is the plaintiffs' motion for summary judgment.

1

The plaintiffs, CAI International, Inc ("CAI"), Cronos Containers Limited ("Cronos"), and Textainer Equipment Management (U.S.) Limited ("Textainer"), the successor in interest to Capital Lease Limited ("Capital"), own and/or manage a large fleet of "intermodal" shipping containers.[1]  The plaintiffs each leased a large number of containers to a third party company, TOPtainer Container Management & Sales ("TOPtainer"), which in turn leased those containers to the Army.  At the expiration of the lease between TOPtainer and the Army in 2004, the Army did not return all of the leased containers.  Rather, the Army exercised a provision in its lease with TOPtainer that provided that containers not returned at the end of a grace period could be "deemed lost" such that the government would pay a depreciated reimbursement price per container to TOPtainer and title to the containers would pass to the government.  TOPtainer submitted "buyout" invoices to the Army in 2004 and 2005, and the Army paid TOPtainer for the containers.  TOPtainer never remitted the buyout payments to the plaintiff owners of the containers.  It is not disputed that TOPtainer cannot be located.

The plaintiffs claim in their motion for summary judgment that the undisputed facts establish that the United States failed to return 1015 leased containers to TOPtainer at the end of the TOPtainer lease and that the plaintiffs, as title holders to the containers, never received payment for the containers.  The plaintiffs argue that TOPtainer was not authorized to sell their containers to the Army under the terms of their contracts with

---

[1] These shipping containers are the type used to transport cargo on large ships and flatbed trailers.

TOPtainer and that the plaintiffs never authorized the transfer of title to the Army.  In such circumstances, the plaintiffs claim, regardless of the payment made to TOPtainer, the government took their property without paying just compensation in violation of the Fifth Amendment.  They seek $1,583,594.69 from the government, representing the replacement value of the containers less amounts CAI received from TOPtainer, plus interest.

The government argues in response that there are disputed issues of fact which preclude a grant of summary judgment.  In particular, the government argues that the plaintiffs in their contracts with TOPtainer agreed to accept payment in lieu of the return of containers that were lost and that where the containers were lost the government was authorized to pay TOPtainer for the "lost" containers.  The government argues that, to the extent the containers were "lost"—or "deemed lost" because they could not be found— there can have been no Fifth Amendment taking because the plaintiffs contracted with TOPtainer to accept payment in lieu of return of the containers.  In other words, the government argues that the plaintiffs relinquished their property interest in lost containers in exchange for payment by TOPtainer under the terms of their contracts with TOPtainer.  For this reason, the government argues, the plaintiffs' sole remedy for the lost containers is against TOPtainer for breach of contract.

The parties agree that, to the extent the government is found liable for a Fifth Amendment taking, just compensation is set by the replacement value provision in Clause H-6 of the government's Master Lease with TOPtainer.  The parties disagree,

3

however, as to the measure of interest to be applied to any taking award.

For the reasons that follow, the court finds that there are disputed issues of fact that preclude summary judgment on the issue of liability, and thus the plaintiffs' motion for summary judgment must be denied.

## I.   BACKGROUND

The following facts are undisputed unless otherwise noted.

### A.   Capital/Textainer-TOPtainer Lease

Capital/Textainer, entered into its Master Lease Agreement–Economic Terms and Conditions ("ETC") and Master Lease Agreement-General Terms and Condition ("GTC") with TOPtainer on March 1, 1999.  The lease was to remain in effect until ninety days after either party served written notice upon the other.  Pls.' Mot. Summ. J. Ex. 5, ECF No. 27.  Under the lease, Capital/Textainer[2] agreed to supply containers to TOPtainer on a priority basis to meet TOPtainer's needs.

The relevant provisions of the agreement between Capital and TOPtainer stated as follows:  Section J(5)(b) of the GTC provided:

> [E]xcept in interchange to other carriers in the ordinary course of business, Lessee shall not sublet, rent, hire out, part with possession, or otherwise transfer any Container to any other person, firm or corporation without the prior written consent thereto of Capital, which consent may be withheld at the absolute discretion of Capital.

Id.  At the time of the lease, Capital/Textainer knew of and consented to TOPtainer's sublease of the containers to the Army.  Id. Ex. 1.  Regarding the replacement value of

---

[2] Textainer became the successor in interest to Capital on September 1, 2007.

4

containers lost or destroyed, Section E of the GTC provided:

> As between Capital and Lessee, Lessee shall bear the entire risk of all loss or damage to the containers during the term of this Agreement.  In the event of total constructive or physical loss to a container, Lessee shall pay Capital the depreciated replacement value of the container as specified in ECT . . . (1) In the event of total constructive or physical loss of a container while on lease to Lessee, salvage rights shall be retained by Lessee.  Lessee shall, at its expense, remove from each container all markings and lettering pertaining to Capital and its ownership of the container . . . .

Id. Ex. 5.  Textainer did not receive compensation for 477 containers owned by Capital and leased to TOPtainer that were not returned by the government to TOPtainer at the end of the government's lease with TOPtainer.

### B.     CAI-TOPtainer Lease

CAI entered into a lease agreement with TOPtainer on November 4, 2002.  Id. Ex. 6.  Section 10(a) of the lease, "Subleasing, Direct Interchanging and Assignment," provides:

> Lessee shall not have the right to assign this agreement or to assign, sublet, rent, directly interchange or otherwise hire out or part with possession of the equipment to any other party (other than to this care of connecting carriers in the normal course of lessee's business) without the prior written consent of lessor and such consent of lessor, if given, shall not operate to relieve lessee of any of its obligations hereunder.

Id.  At the time of the lease, CAI knew of and consented to TOPtainer's sublease of the containers to the Army.  Id. Ex. 7.

Section 3(b), "Loss or Total Damage," provides:

> In the event of loss, theft or destruction of the equipment (an "Event of Loss") or damage thereto which Lessor, in its sole discretion, shall determine is not structurally or economically repairable (an "Event of

> Constructive Loss"), rental charges for the affected equipment shall terminate (1) upon receipt by Lessor of written notice from Lessee of an Event of Loss, or (2) upon issuance by Lessor of a written notice to Lessee of an Event of Constructive Loss, provided in either event that payment of the Casualty Value for a like item of equipment (as set forth herein or in Lessor's then current Casualty Value Schedule) is made to Lessor within 30 days of such notice.

Id. Ex. 6.  The government did not return to TOPtainer 435 containers belonging to CAI.

CAI did not receive any payment from TOPtainer for these containers.

### C.   Cronos-TOPtainer Lease

Cronos entered into a lease agreement with TOPtainer on September 17, 2003.  Id.

Ex. 8.  No section of this lease directly addresses TOPtainer's rights, or lack thereof,

regarding transfer or assignment of containers to a third party.  Cronos consented to

TOPtainer's sublease of the containers to the Army.  Id. Ex. 4.  However, Section 7 of the

lease provides:

> LESSEE shall notify LESSOR in writing if any Equipment cannot be redelivered, such notification shall include a detailed description of the nature of the loss.  LESSOR shall off hire the Equipment on the date of written notification, and shall issue an invoice to LESSEE for the Depreciated Replacement Value of the Equipment . . . .

Id. Ex. 8.  Section 8, "Depreciated Replacement Value," provides:

> If Equipment is lost or destroyed (damaged in excess of the DRV) . . . LESSEE shall be liable for the Equipment's Depreciated REPLACEMENT VALUE (DRV). . . . Equipment lost or destroyed by LESSEE shall, at the sole discretion of LESSOR, become the property of LESSEE . . . .

Id.  The government did not return 103 containers belonging to Cronos to TOPtainer.

Cronos has not received any compensation for these containers.

### D.      TOPtainer-Army Lease

TOPtainer entered into its Master Lease with the Army on September 30, 1997.

Id. Ex. 9.  Pursuant to the Master Lease, TOPtainer leased containers belonging to the

plaintiffs and subleased those containers to the Army to fulfill the Army's needs.  The

Army's lease was to expire July 1, 2004.  Clause H-7 of that lease provides:

> The Government shall have a period of ninety (90) days, from the date of
> expiration of the lease period, to continue leasing containers at the same per
> diem rate as the expired lease period.  Containers or chassis not redelivered
> by the completion of the contract period and not returned to the contractor
> within the ninety (90) day redelivery period, may be deemed lost.  At the
> time a unit(s) is determined lost or deemed lost by operation of this clause,
> title of the unit(s) will transfer from the contractor to the government.  The
> contractor will be provided reimbursement for all "lost" units upon proper
> invoice, at the depreciated reimbursement price.  The contractor shall notify
> the Government upon completion of the . . . lease period that the ninety
> (90) day redelivery period has commenced.

Id.

### E.      The Army's Container "Buyout"

After the expiration of the lease between TOPtainer and the Army on July 1, 2004,

the Army determined it could not locate certain containers that it had leased from

TOPtainer and thus the Army would not be able to return all of the leased containers by

the end of the ninety-day grace period provided for in clause H-7 of the Master Lease.

By October 1, 2004, the government decided that it would conduct a buyout of containers

"deemed lost" pursuant to clause H-7 by remitting payment for these containers to

TOPtainer.  During late 2004 and 2005, TOPtainer submitted buyout invoices to the

Army for the buyout transaction related to these containers.  The United States, in

response, issued modifications to the TOPtainer lease authorizing the payment of funds

per diem to the date of the buyout and additional funds for the buyout of the containers,

which amounted to approximately 477 leased by Capital/Textainer, 435 by CAI, and 103

by Cronos.  The United States then paid the invoices directly to TOPtainer.  The United

States at no time requested or obtained the plaintiffs' express consent for the buyout.

> The government rejected requests from CAI and Capital/Textainer that the

government make payments directly to those plaintiffs, taking the position that the

govenrment's lease with TOPtainer required this arrangement regardless of the plaintiffs'

problems with TOPtainer.  On August 4, 2004, Claudio Paiva of Capital wrote to

Leonard Priber, the lead contractor at the Army's Surface Deployment and Distribution

Command responsible for closing out the leases, stating, "Toptainer is selling Capital

Lease units without authorization and for this reason I would like to check with you if

there is any possibility of stopping the redelivery for them.  Toptainer is in default, which

means that they no longer have the possession of those units."  Id. Ex. 17.  Mr. Priber

responded, stating:

> [A]s you can appreciate we have a delicate situation because of the contract
> we have with Toptainer.  I have informed our Contracting Officer of the
> situation as you presented to me.  He has indicated that for us to take any
> action without a legal order from the court would be a [breach] of our
> contract with Toptainer.

Id.  Karen Szeto of CAI exchanged a series of emails with Mr. Priber in 2005.  She

inquired as to the status of containers the government had leased from TOPtainer.  Mr.

Priber explained that the government was in the process of paying TOPtainer for

"purchases" of lost containers.  Id. Ex. 18.  Ms. Szeto responded on February 8, 2005,

"That would be a problem as these units are CAI's asset and Toptainer has no right to sell

these containers."  Id.  Mr. Priber wrote back:

> [I]f you have the means of stopping the sell [sic] of your equipment by
> Toptainer you will need to do so quickly as the payments are being sent to
> Toptainer.  Since our contract with Toptainer requires that we purchase the
> units if we are unable to redelivery [sic] within 90 days of expiration date
> of lease we cannot stop this action unless you have a legal stop order.

Id.  In later correspondence, Ms. Szeto notified Mr. Priber that because CAI had not yet

received payment for the containers involved in the government's buyout,

"title/ownership to the subject containers has not transferred."  Id.

### F.      Okinawa Discovery

In February 2010, seventeen months after the filing of the complaint in this case,

Sergeant Robert Rudolph, a U.S. Marine stationed in Okinawa, emailed Capital/Textainer

asking whether the company had any record of the U.S. Marine Corps "owning or

leasing" intermodal containers from Capital/Textainer.  Id. Ex. 23.  Capital/Textainer was

able to verify from a list of the containers' unique numbers that 122 containers located in

Okinawa were containers leased by TOPtainer and subject to the government's 2005

buyout.

### G.      Disputed Facts

The government relies on deposition testimony of the plaintiffs' representatives,

which provides that the plaintiffs agreed that if the containers they leased were in fact

lost, the plaintiffs would accept payment from TOPtainer in the amount of the containers'

depreciated replacement value ("DRV") in exchange for title to the containers.  For

instance, Textainer representative Richard Murphy acknowledged that the

Capital/Textainer lease contained a provision allowing for the "buyout" of containers that

were "lost or damaged."  Def.'s Resp. to Mot. Summ. J. Ex. A (Murphy Dep. 77), ECF

No. 29.  Cronos representative Tim Courtenay stated in his deposition that it was

understood that if a lessee made DRV payments under the lease, ownership of those

containers would pass to TOPtainer.  Id. Ex. C (Courtenay Dep. 89.).  The government

has also provided deposition testimony to support its claim that the containers were, in

fact, lost.  In their depositions, Edward Dawson, Mr. Priber, and Shelley Johnson stated

that the Army did not simply deem containers that were in use, as "lost."  Mr. Dawson,

the contracting officer who oversaw the administration of the Master Lease at the

Military Surface Deployment and Distribution Command ("SDDC") explained, "No one

deems something lost or identifies it as lost knowing that next door in the container yard

platoon X or company Y is using the equipment."  Id. Ex. F (Dawson Dep. at 74-75).

Mr. Priber, testified, "We could not find the equipment.  It was just a case of not being

able to locate the equipment and take whatever action needed to be taken to return it to

the company."  Id. Ex. D (Priber Dep. at 43).  Mr. Priber explained that the Army's

search for the missing containers was "elaborate" and continued through 2007.[3]  Id.

---

[3] Mr. Priber testified:

> We were working with so many different parties that might have information on
> the location of the equipment.  Again, we would start with the party that leased

(Priber Dep. at 126-27).  Ms. Johnson, a SDDC supervisor responsible for the contract closeout, testified, "[T]hey were deemed to be lost because of the fact that . . . we were not able to locate the containers.  We went through various means of trying to locate the containers.  We could not locate them."  Id. Ex. E (Johnson Dep. at 42).  Finally, the government has evidence to show that the plaintiffs did not object to the TOPtainer "buyout" arrangement for lost containers during the course of the contract, but are now objecting to the subject "buyouts" because they did not receive payment from TOPtainer.

The plaintiffs point to other evidence in support of their motion for summary judgment.  They rely on evidence to suggest that the containers were not lost and that the government changed course at the end of the TOPtainer lease when it decided to "buy" the containers rather than return them to their rightful owners.  For instance in an email from Mr. Priber, to a representative of Cronos, Mr. Priber stated, "Many of these containers [purchased from TOPtainer] are being used in support of the war in Iraq which

---

the equipment and determine what records they had to indicate what they did with the equipment and then we would go to the next party that received the equipment, try to get in touch with them to try to determine what they did with the equipment, we worked with ocean carriers, we worked with port authorities, we worked with overseas commands, we worked with transportation officers all over the United States.  We had e-mails and exchanges with them asking them to provide us with a list of containers which may be just sitting on the depot, that they had a container, just give us a container number and from that we could determine if it was one of the containers that were included on our leases.  It was very extensive and as I indicated earlier in the deposition, we never gave up.  I mean, up until we left the office in October, November of 2007 we continued to search for those equipment, search for that equipment and if we found any then we would try to reverse the buyout process.

Def.'s Resp. to Mot. Summ. J. Ex. D (Priber Dep. at 43).

is why they could not be redelivered before the expiration of the lease with Toptainer."

Pls.' Mot. Summ. J. Ex. 21.  He also stated, "Obviously we are concerned with what

happens to this equipment which has been purchased since we do expect it to eventually

return from Iraq, Kuwait and Afghanistan when the units begin redeploying."  Id. Ex. 22.

Based on these statements, the plaintiffs contend that the government acted outside of its

contract with TOPtainer—and thus in its sovereign capacity—when it elected to keep the

containers rather than return them to TOPtainer at the conclusion of the lease period.  The

plaintiffs contend that the evidence establishes that the plaintiffs did not consent to the

sale or "buyout" of their containers and that, without their consent, TOPtainer did not

have permission to sell their containers.  Further, the plaintiffs contend that the evidence

demonstrates that the government knew of their objections to any sale of the containers.

## II.    DISCUSSION

### A.    Standard of Review

Pursuant to Rule 56 of the Rules of the Court of Federal Claims, summary

judgment is appropriate when "the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material fact and that

the movant is entitled to judgment as a matter of law."  RCFC 56(c)(1); see also

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Casitas Mun. Water Dist.

v. United States, 543 F.3d 1276, 1283 (Fed. Cir. 2008); Telemac Cellular Corp. v. Topp

Telecom, Inc., 247 F.3d 1316, 1323 (Fed. Cir. 2001) (citation omitted).  In considering a

motion for summary judgment, the court's role is not to "weigh the evidence and

12

determine the truth of the matter but to determine whether there is a genuine issue for

trial." Liberty Lobby, 477 U.S. at 249.  "The evidence of the nonmovant is to be

believed, and all justifiable inferences are to be drawn in his favor."  Id. at 255; see also

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Lathan

Co., Inc. v. United States, 20 Cl. Ct. 122, 125 (1990); Casitas Mun. Water Dist., 543 F.3d

at 1283.

## B.     Liability

The plaintiffs allege that their rights under the Fifth Amendment's Takings Clause

were violated as a result of the government's purported purchase of the plaintiffs'

shipping containers from TOPtainer, because TOPtainer did not have the right to sell

their containers to the government.  The Takings Clause of the Fifth Amendment

provides that "private property [shall not] be taken for public use, without just

compensation."  U.S. Const. amend. V.  The plaintiffs assert that they alone held title to

the containers and that TOPtainer did not have authority to transfer title to the United

States without their consent.  In such circumstances, the plaintiffs argue, the government,

acted in its sovereign capacity when it decided to keep the plaintiffs' containers and take

title to the containers without their consent.  The plaintiffs seek just compensation on this

basis.

The government argues that it did not "take" the plaintiffs' property, because the

plaintiffs' property interests were modified by their agreements with TOPtainer, pursuant

to which the plaintiffs agreed to accept payment from TOPtainer in the event the

government "lost" their containers.  The government argues that it "lost" the 1015

containers at issue and that it properly paid TOPtainer for the containers pursuant to its

contract.  The government argues that its decision to pay for the lost containers was not a

sovereign act, but was a measure required by its contract and undertaken fully within the

government's proprietary capacity.  Under the government's theory, the plaintiffs' sole

remedy is against TOPtainer for breach of contract.

      **1.**      **The plaintiffs agreed to accept payment from TOPtainer in the event the plaintiffs' containers were lost or destroyed by the Army.**

When evaluating whether a government action constitutes a taking, courts employ

a two-part test.  "First, the court determines whether the claimant has identified a

cognizable Fifth Amendment property interest that is asserted to be the subject of the

taking.  Second, if the court concludes that a cognizable property interest exists, it

determines whether that property interest was 'taken.'"  Acceptance Ins. Cos., Inc. v.

United States, 583 F.3d 849 (Fed. Cir. 2009) (citing Palmyra Pac. Seafoods, L.L.C. v.

United States, 561 F.3d 1361, 1364 (Fed. Cir. 2009); Air Pegasus of D.C., Inc. v. United

States, 424 F.3d 1206, 1212-13 (Fed. Cir. 2005); Am. Pelagic Fishing Co. v. United

States, 379 F.3d 1363, 1372 (Fed. Cir. 2004); Conti v. United States, 291 F.3d 1334,

1339 (Fed. Cir. 2002)).

"Not every deprivation of use, possession, or control of property is a taking."  Sun

Oil Co. v. United States, 572 F.2d 786, 818 (Ct. Cl. 1978).  The government has not

taken property where it acts in its proprietary capacity pursuant to a contract right; to

effect a taking, the government must act pursuant to its sovereign powers or invoke sovereign protections.  See Janicki Logging Co., Inc. v. United States, 36 Fed. Cl. 338, 346 (1996) ("[A]t all times, the Forest Service purported to act pursuant to and consistent with the terms of the contract and never suggested that it was not bound by each term in the contract, including the provisions concerning dispute resolution.  Hence, rather than acting as a sovereign and taking plaintiff's property for public use, the Forest Service acted in a proprietary capacity as a party to a contract and purported to exercise its rights for which it bargained in the contract.").  Where a property owner grants the government permission to use or occupy the plaintiffs' property by agreement, the government's use or occupation of that property does not give rise to a taking.  See, e.g., J.J. Henry Co. v. United States, 411 F.2d 1246, 1249 (Ct. Cl. 1969) ("The clear thrust of the authorities is that where the government possesses property under the color of legal right, as by an express contract, there is seldom a taking in violation of the Fifth Amendment.  The amendment has limited application to the relative rights in property of parties litigant which have been voluntarily created by contract." (citing Consolidation Coal Co. v. United States, 60 Ct. Cl. 608 (1925), appeal dismissed, 270 U.S. 664 (1926); Klebe v. United States, 57 Ct. Cl. 160 (1922), aff'd, 263 U.S. 188 (1923); 2 Nichols on Eminent Domain § 6.1 (3d ed. 1963))); Scogin v. United States, 33 Fed. Cl. 285, 291 (1995) ("a property owner relinquished the right to exclude when the owner consents to the entry, use, and occupation of subject property"); BRM Gold Corp. v. United States, 41 Fed. Cl. 277, 282 (1998) (finding no taking where a plaintiff granted permission to the military to

15

cross his land, and so "lack[ed] the necessary elements of coerciveness" for a taking).

Further, where the government acts pursuant to its contracting authority, a taking arises

only if some intervening sovereign act is identified.  See Armstrong v. United States, 364

U.S. 40, 48-49 (1960) (finding the government liable for a taking where the government's

sovereign status rendered it immune from suit by third parties holding liens on property

that passed to the government by virtue of the terms of a contract).  As the Supreme

Court explained, a taking occurred in Armstrong "because the Government for its own

advantage destroyed the value of the liens, something that the Government could do

because its property was not subject to suit, but which no private purchaser could have

done." Id. at 48 (emphasis added).  It was the government's status as a sovereign that

triggered the constitutional obligation to pay just compensation, even where the

government's receipt of the property at issue occurred in a contractual context.  See id. at

48-49.

        In this case, the court agrees with the government that if the plaintiffs, through

their leases or otherwise, granted TOPtainer permission to accept payment in exchange

for containers lost by the government, then the government did not take the plaintiffs'

containers when the government lost the containers and made payments to TOPtainer.  If

the plaintiffs did not receive payment for the lost containers, their proper remedy is a

contractual one against TOPtainer.  Put another way, for the court to find a taking, the

plaintiffs must identify a cognizable property interest that the government took separate

from the rights the plaintiffs relinquished in their contracts with TOPtainer with regard to

the subject containers.

When interpreting contract language, "[c]ontract terms are given their plain and ordinary meaning, unless the provisions are ambiguous." Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 824 (Fed. Cir. 2010) (citing Ala. Lumber & Pulp v. Madigan, 2 F.3d 389, 392 (Fed. Cir. 1993)). "The contract must be construed to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract." Arko Exec. Servs., Inc. v. United States, 553 F.3d 1375, 1379 (Fed. Cir. 2009) (quoting Hercules Inc. v. United States, 292 F.3d 1378, 1380-81 (Fed. Cir. 2002)).

An examination of the contracts by which the plaintiffs, Capital/Textainer, CAI, and Cronos, leased containers to TOPtainer reveals that the plaintiffs agreed to accept payment in exchange for the containers in the event that the containers at issue were "lost." Regarding the Capital/Textainer-TOPtainer lease, Section E of the TOPtainer/Capital contract provides, "In the event of total constructive or physical loss to a container, Lessee shall pay Capital the depreciated replacement value of the container as specified in ECT . . ." Pls.' Mot. Summ. J. Ex. 5. The same is true for the CAI lease. Section 3(b) of the CAI lease provides, "Loss or Total Damage," provides:

> In the event of loss, theft or destruction of the equipment . . . or damage thereto which Lessor, in its sole discretion, shall determine is not structurally or economically repairable . . . rental charges for the affected equipment shall terminate . . . provided . . . that payment of the Casualty Value for a like item of equipment . . . is made to Lessor . . . .

Id. Ex. 6. Finally, the same rights were given to TOPtainer in the Cronos lease, which provides in Section 8, "Depreciated Replacement Value":

17

> If Equipment is lost or destroyed (damaged in excess of the DRV) . . .
> LESSEE shall be liable for the Equipment's Depreciated REPLACEMENT
> VALUE (DRV). . . . Equipment lost or destroyed by LESSEE shall, at the
> sole discretion of LESSOR, become the property of LESSEE . . . .

Id. Ex. 8.  Thus, the plaintiffs, knowing their containers were in use by the government,

agreed to accept payment from TOPtainer, and TOPtainer alone, if the government lost

the plaintiffs' containers.

In addition, the court also agrees with the government that there is no distinction

between containers that were "deemed lost" and those that were actually "lost" under the

TOPtainer lease.  The court finds that the relevant definition of "loss" is, "[t]he failure to

maintain possession of a thing," and "lost" is defined as, "beyond the possession and

custody of its owner and not locatable by diligent search."  See Black's Law Dictionary

1030, 1031 (9th ed. 2009).[4]  Thus, the government acted within the scope of its contract

with TOPtainer and consistent with the plaintiffs' contracts with TOPtainer to the extent

the government reasonably determined that the subject containers were "lost," i.e.,

"beyond the possession and custody [of the government] and not locatable by diligent

search."

---

[4] Black's Law Dictionary defines "constructive total loss" as, "[s]uch serious damage to the
insured property that the cost of repairs would exceed the value of the thing repaired."  Black's
Law Dictionary 1030 (9th ed. 2009).  The American Heritage Dictionary defines "lost" as, "no
longer in the possession, care, or control of someone or something," and defines "lose" as, "be
unsuccessful in retaining possession of; mislay."  American Heritage Dictionary of the English
Language 1035 (4th ed. 2000).  Merriam-Webster's Dictionary defines "lost" as, "no longer
possessed," and defines "lose" as, "miss from one's possession or from a customary or supposed
place."  Merriam-Webster's Collegiate Dictionary 736 (11th ed. 2003).  The New Oxford
Dictionary defines "lost" as, "unable to be found."  New Oxford American Dictionary 1033 (3d
ed. 2010).  Webster's defines "lost" as, "no longer possessed," and, "no longer able to be found."
Random House Webster's College Dictionary 785 (2d ed. 1999).

2.     **Disputed issues of fact preclude summary judgment as to whether the plaintiffs' containers were "lost" and thus whether the government acted in its sovereign capacity when it did not return the containers to TOPtainer.**

The plaintiffs contend that the containers at issue in this case were not lost, but were in use in Iraq and elsewhere, and that the government acted in its sovereign capacity rather than its proprietary capacity when it decided to keep the plaintiffs' containers at the end of its lease with TOPtainer. In support of this contention, the plaintiffs rely on emails from a government contractor, Mr. Priber, to Capital and Cronos that indicate that the government understood that some of the containers at issue remained in the Army's possession and use at the time of the buyout.[5] The plaintiffs further point to the undisputed fact that 122 containers were found in the military's possession in Okinawa after the filing of this lawsuit, which the plaintiffs argue suggests that these containers were not in fact "lost" or destroyed. Finally, the plaintiffs rely on the fact that over 1000 containers were not returned, arguing that it is inconceivable that the government could truly lose so many containers. The plaintiffs argue that all of this evidence—together with the fact that two of the plaintiffs voiced their objections to the transaction at the time of the government's buyout—demonstrates that the government decision to buyout the 1015 containers was a sovereign act and amounted to a taking of their containers without the payment of just compensation.

_____

[5] For instance, Mr. Priber stated, "Many of these containers [purchased from TOPtainer] are being used in support of the war in Iraq which is why they could not be redelivered before the expiration of the lease with Toptainer." Pls.' Mot. Summ. J. Ex. 21. He also stated, "Obviously

The government argues based on the testimony of Mr. Priber and others that the Army determined that the containers were indeed "lost" and that the government paid TOPtainer for the lost containers pursuant to the terms of its contract and in its proprietary capacity.  The government relies on deposition testimony from several government officials and contractors to the effect that it was only after the Army could not locate the containers after a diligent search that the government determined the containers to be "lost" and paid TOPtainer.[6]  The government argues that there is no evidence that a sovereign act occurred in connection with the buyout of the subject containers.  To the contrary, the government points to evidence to show that it determined that it had a contractual obligation to pay TOPtainer for the containers under the contract.

---

we are concerned with what happens to this equipment which has been purchased since we do expect it to eventually return from Iraq, Kuwait and Afghanistan when the units begin redeploying."  Id. Ex. 22.

[6] Mr. Priber also testified:

> We were working with so many different parties that might have information on the location of the equipment.  Again, we would start with the party that leased the equipment and determine what records they had to indicate what they did with the equipment and then we would go to the next party that received the equipment, try to get in touch with them to try to determine what they did with the equipment, we worked with ocean carriers, we worked with port authorities, we worked with overseas commands, we worked with transportation officers all over the United States.  We had e-mails and exchanges with them asking them to provide us with a list of containers which may be just sitting on the depot, that they had a container, just give us a container number and from that we could determine if it was one of the containers that were included on our leases.  It was very extensive and as I indicated earlier in the deposition, we never gave up.  I mean, up until we left the office in October, November of 2007 we continued to search for those equipment, search for that equipment and if we found any then we would try to reverse the buyout process.

Def.'s Resp. to Mot. Summ. J. Ex. D (Priber Dep. 43).

The court finds based on the evidence presented that there are disputed issues of material fact that require denial of the plaintiffs' motion for summary judgment. The government has presented evidence to show that its conclusion that it could not return the containers to TOPtainer and its decision to pay TOPtainer for the containers were made pursuant to the government's contract with TOPtainer. The plaintiffs understood at the time they entered into leases with TOPtainer that if the subject containers were determined to be lost after a diligent search, the plaintiffs were only entitled to payment from TOPtainer. The court thus agrees with the government that the plaintiffs have failed to establish through undisputed evidence that the government was acting in its sovereign, rather than proprietary, capacity when it conducted the buyout of the "lost" containers. Given the disputed facts regarding the reasons for the government's buyout of the containers, the plaintiffs are not entitled to summary judgment on their taking claims.[7]

## C.    Damages

Although summary judgment on liability must be denied because material facts are in dispute, the parties nonetheless agree that in the event the court finds a taking, the measure of just compensation in this case shall be calculated using the DRV of containers established in clause H-6 of the government's contract with TOPtainer. See Pls.' Suppl. Mot. Partial Summ. J. Damages 4-7, ECF No. 49; Def.'s Cross-Mot. Partial Summ. J.

---

[7] The cases relied upon by the plaintiffs regarding the situation in which the government in condemning land paid compensation to a party that did not own the property at issue, Houser v. United States, 12 Cl. Ct. 454 (1987), and Yaist v. United States, 228 Ct. Cl. 281 (1981), are not relevant where, as here, the existence of a sovereign act giving rise to a taking is in dispute.

Damages 1, ECF No. 58.  The DRV of any individual container is based on a full new replacement value of $2700, minus 6% annual depreciation.  The court agrees with the parties that use of the DRV established in the government's lease is an appropriate measure of just compensation.

While the value of the containers may be settled between the parties, the issue of interest is not.  The government agrees with the plaintiffs that should the court find that the buyout of containers resulted in a taking, the plaintiffs will also be entitled to interest as part of just compensation "sufficient to ensure that [the plaintiffs are] placed in as good a position pecuniarily as [they] would have occupied if the payment had coincided with the appropriation."  Kirby Forest Indus., Inc. v. United States, 467 U.S. 1, 10-11 (1984) (citing Phelps v. United States, 274 U.S. 341, 344 (1927); Seaboard Air Line Ry. v. United States, 261 U.S. 299, 306 (1923)).  The parties disagree, however, as to what the measure of such interest should be.

The plaintiffs argue that the court should measure the "actual economic harm" caused by the government's delay in providing compensation by calculating the estimated income that the owners/operators of the containers would have earned by leasing the containers during the relevant period.  The plaintiffs submit that (1) containers in the industry are leased approximately 90% of the time and (2) the industry-wide average per diem lease income for a container is $.82 per day, resulting in a daily average revenue figure of $.73 per day.  The plaintiffs further calculated that Textainer's fleet of containers averaged $.70 per day.  The plaintiffs multiplied this $.70 figure by the

number of days elapsed since the date of the alleged taking, calculating a total of $1,597

in lost revenue per container as of April 15, 2011.  The plaintiffs then converted this total

into an effective interest rate applied to the DRV value of the containers, calculating an

effective interest rate of 10.39% compounded annually.  Thus, the plaintiffs argue, the

court should apply an interest rate of 10.25% (rounded down from 10.39%) to the

damages figure in order to appropriately reflect the average rate of return on containers

from 2005 through 2010.  As an alternative, the plaintiffs suggest application of the

Moody's Corporate Bond Index of Yields on Long-Term Corporate Bonds as did this

court's predecessor in Pitcairn v. United States, 547 F.2d 1106 (Ct. Cl. 1976) (as "delay

compensation" in a patent case), and Miller v. United States, 620 F.2d 812 (Ct. Cl. 1980)

(a physical takings case).[8]

    The defendant argues that the court should instead apply an interest rate that is no

more than the rate set forth in the Declaration of Takings Act, 40 U.S.C. § 3116

("DTA"), which is based on the "weekly average one-year constant maturity Treasury

yield."[9]  40 U.S.C. § 3116.  The government argues that although courts have applied

other rates in certain cases under "extenuating circumstances or unusual facts," Def.'s

Cross-Mot. Partial Summ. J. Damages 5, the Court of Federal Claims most frequently

uses the rates set forth in the DTA as the measure of interest applicable to a claim for just

compensation.  The defendant contends that nothing in this case warrants a departure

---

[8] The plaintiff notes that this rate is currently approximately 5.5%.
[9] The plaintiff notes that this rate is currently 2.62%.

from the norm of use of the DTA rate.  For the reasons set forth below, the court agrees

with the government.

The Supreme Court explained in Kirby:

[T]he Fifth Amendment does not forbid the Government to take land and
pay for it later.  But if disbursement of the award is delayed, the owner is
entitled to interest thereon sufficient to ensure that he is placed in as good a
position pecuniarily as he would have occupied if the payment had
coincided with the appropriation.

Kirby, 467 U.S. at 10; see also Seaboard, 261 U.S. at 306 (fair market value must be

adjusted by "such addition as will produce the full equivalent of that value paid

contemporaneously with the taking.").  In other words, "Delay in payment entails more

than delay in possession of the award.  It also necessarily means delay in the use of the

money.  Full compensation, then, requires that a [property owner] whose award has been

delayed be compensated for his inability to utilize his money."  Whitney Benefits, Inc. v.

United States, 30 Fed. Cl. 411, 414-15 (1994); see also NRG Co. v. United States, 31

Fed. Cl. 659, 664 (1994).  This court has previously explained the question of the

measure of interest as an aspect of just compensation:

Although no consensus has emerged with regard to the appropriate interest
rate to be employed in just compensation cases (see, e.g., Eastern Minerals
Int'l, Inc. v. United States, 39 Fed. Cl. 621, 631 n. 13 (1997) (applying the
tax overpayment rate set forth in 26 U.S.C. § 6621); NRG, 31 Fed. Cl. at
670 (applying the Declaration of Taking Act rate set forth in 40 U.S.C. §
258e-1); Formanek v. United States, 26 Cl. Ct. 332, 341 n. 11 (1992)
(applying the Contract Disputes Act rate set forth in 41 U.S.C. § 611)),
courts have universally sought to honor two basic principles in calculating
interest on awards paid after the date of taking.  First, courts have
uniformly endeavored to "ensure that [the property owner] is placed in as
good a position pecuniarily as he would have occupied if the payment had

> coincided with the appropriation." <u>Kirby</u>, 467 U.S. at 10.  Second, courts
> have generally recognized the "strong judicial policy in favor of the
> establishment of a uniform rate of interest applicable to condemnation cases
> in order to avoid discrimination among litigants." <u>Miller v. United States</u>,
> 620 F.2d 812, 838 (Ct. Cl. 1980).

<u>Tulare Lake Basin Water Storage Dist. v. United States</u>, 61 Fed. Cl. 624, 626-27 (2004).

The court in <u>Tulare</u> examined whether it should adopt the plaintiff's argument that the

court should use the "prudent investor rule" to calculate an interest rate based on how "a

reasonably prudent person" would have invested the funds to "produce a reasonable

return while maintaining safety of principal," <u>id.</u> at 627 (citing <u>United States v. 429.59</u>

<u>Acres of Land</u>, 612 F.2d 459, 464-65 (9th Cir. 1980)), or whether the court should, in the

interest of uniformity and easy applicability, adopt the Treasury bill rate specified by the

DTA, <u>id.</u> at 628.

As the plaintiffs point out, there is precedent to support the use of either approach.

However, use of the plaintiffs' rate in this case would provide them with an

impermissible windfall.  The court finds that the plaintiffs' theory of interest is not based

on the prudent investor rule, but is based on a misconception regarding the purpose of

interest as part of just compensation in a takings case.  As the Supreme Court has stated,

the purpose of interest is to put a property owner in "as good a position pecuniarily as he

would have occupied if the payment had coincided with the appropriation." <u>Kirby</u>, 467

U.S. at 10.  In other words, interest is compensation for the lost use of the <u>takings award</u>

between the date of the taking and the date of the payment.  The plaintiffs' theory of

interest, however, seeks compensation, in effect, for the lost use of the <u>taken property</u>

during this period.  In essence, the plaintiffs seek rental payment for the containers in addition to the DRV, or "buyout," payment.  It is for this reason that application of such a rate would result in an impermissible windfall for the plaintiffs.

The court further finds that the DTA rate, and not the Moody's Corporate Bond Index rate, should serve as the default.  The plaintiffs have presented no evidence supporting the application of the Moody's Corporate Bond Index rate in this case.  Thus, the court also denies the plaintiffs' motion for summary judgment with regard to use of the Moody's Corporate Bond Index rate.  Absent special proof, the statutorily-set rate in the DTA shall apply.[10]  Use of this rate furthers the pursuit of uniform treatment of awardees in takings actions and adequately compensates the plaintiffs in this case for the delay in payment of compensation for any taking the court may find.

## III.   CONCLUSION

For the foregoing reasons, the plaintiffs' Motion for Summary Judgment on liability is **DENIED**, the plaintiffs' Motion for Summary Judgment on the Issue of Just Compensation/Damages is **GRANTED-IN-PART** (with respect to use of the DRV schedule) and **DENIED-IN-PART** (with respect to the measure of interest), and the defendant's Cross-Motion for Partial Summary Judgment on damages is **GRANTED**. The parties shall file a joint status report by **July 18, 2011** detailing next steps for resolving issues remaining in this litigation.

---

[10] The court notes that the DTA provides for the annual compounding of interest in periods of delay more than one year.  See 40 U.S.C. § 3116(a)(2).

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge