# In the United States Court of Federal Claims

No. 08-610C
(Filed: May 15, 2013)

|  |  |
|---|---|
| TEXTAINER EQUIPMENT MANAGEMENT LIMITED, et al., | ) ) ) ) |
| Plaintiffs, | ) |
| v. | ) ) |
| THE UNITED STATES, | ) ) |
| Defendant. | ) ) ) |

**ORDER ALLOWING JOINDER AND SETTING A SCHEDULE FOR LIMITED DISCOVERY**

Pending before the court is plaintiffs' motion to ratify or join Capital Lease Limited ("Capital") as the real party in interest in this case. For the reasons discussed below, the plaintiffs' motion to join Capital as the real party in interest is **GRANTED**. The government has requested that if the court allows Capital to join in this action, the government should be permitted to conduct discovery of Capital. The court also **GRANTS** the government's limited discovery request, and sets forth a schedule for discovery below. The court **STAYS** consideration of the parties' supplemental motions for summary judgment, the determination of the correct interest rate, and plaintiffs' motion for sanctions pending resolution of any government motion against Capital following the close of discovery.

1

I.   **BACKGROUND**

Most of the undisputed facts in this case are laid out in this court's first and second summary judgment opinions, Textainer Equipment Management Ltd. v. United States ("Textainer I"), 99 Fed. Cl. 211 (2011) and Textainer Equipment Management Ltd. v. United States ("Textainer II"), No. 08-610C, 2012 WL 5465983 (Fed. Cl. Nov. 6, 2012), and will be only summarized here.  In brief, the three original plaintiffs in this case, CAI International, Inc. ("CAI"), Cronos Containers Limited ("Cronos"), and Textainer Equipment Management (U.S.) Limited ("Textainer") (a company that manages shipping containers originally owned by Capital) each own and/or manage a large fleet of intermodal shipping containers that were leased to a third party company, TOPtainer. TOPtainer, in turn, leased those containers to the Army pursuant to a Master Lease agreement ("Master Lease") between TOPtainer and the United States.  The plaintiffs were not parties to the Master Lease.  The containers were sent to Iraq and Afghanistan for military use.

Under the terms of the Master Lease, the government took title to any containers that were "lost" or "deemed lost" ninety days after the end of the lease term.  Pls.' First Mot. for Summ. J., Ex. 9, ECF No. 27.  The Master Lease provided that the government would pay TOPtainer for the containers that were either lost or deemed lost.  Id.  The plaintiffs' leases with TOPtainer also had provisions that authorized TOPtainer to pay plaintiffs for containers that were "lost." Id., Exs. 5, 6, 8.  Plaintiffs in their contracts with TOPtainer expressly prohibited TOPtainer from selling their containers or transferring title to the containers without their consent.  At the end of the Master Lease

term, the government paid TOPtainer for approximately 1000 containers that the government claimed it could not find after the lease expired.  Although the government paid TOPtainer for these allegedly "lost" or "deemed lost" containers, TOPtainer did not pay or only partially paid the plaintiffs for the "lost" containers.  TOPtainer is no longer in existence.

### A.     The court's first opinion on summary judgment.

CAI, Cronos, and Textainer filed their original complaint in this court on September 2, 2008, alleging that the government had taken title to their property—their containers—without paying just compensation in violation of the Fifth Amendment of the Constitution of the United States.  On June 17, 2011, the court issued an opinion denying their motion for summary judgment on liability, and granting in part and denying in part their motion for summary judgment on valuation.  The court found that "[t]he government has not taken property where it acts in its proprietary capacity pursuant to a contract right."  Textainer I, 99 Fed. Cl. at 218 (citing Janicki Logging Co., Inc. v. United States, 36 Fed. Cl. 338, 346 (1996)).  Rather, "to effect a taking, the government must act pursuant to its sovereign powers or invoke sovereign protections."  Textainer I, 99 Fed. Cl. at 218 (citation omitted).  The plaintiffs had presented some evidence to show that various containers were not "lost" but that the government had instead simply decided to keep them for military use.  If the government decided to "take title" to the containers outside the scope of the contract, the court held, a sovereign act may have occurred.

Based on the evidence presented by CAI, Cronos, and Textainer, the court held that disputed issues of fact precluded the entry of summary judgment.[1]  Id. at 220-21.

### B.    The court's second opinion on summary judgment.

Following the court's first summary judgment opinion, CAI, Cronos, and Textainer moved to amend their complaint to add third party beneficiary and breach of contract claims.  On January 10, 2012, the court denied plaintiffs' motion for leave to amend their complaint to add contract causes of action.  Opinion, ECF No. 81.  A trial date was then set for March 13, 2012 regarding plaintiffs' takings claims.  At the pre-trial conference on March 2, 2012, the parties requested permission to file renewed cross-motions for summary judgment.  Specifically, plaintiffs presented undisputed evidence to the court to show that 125 containers that had been owned by Capital and were now the subject of plaintiff Textainer's claim were never "lost," but were instead sent to Okinawa, Japan and thus appeared to have been "taken" outside the terms of the Master Lease.  See Pls.' Renewed Mot. at 1, ECF No. 91.  In addition, undisputed evidence showed that Capital had notified the government's legal counsel, before the government took title or authorized any payments for any of the allegedly "lost" containers, that TOPtainer was in default of its contract with Capital and that TOPtainer no longer had any rights to lease

---

[1] The court also addressed the issue of just compensation in this opinion.  The court agreed with the parties' stipulation that if a taking were established the measure of compensation would be calculated using the depreciated replacement value of the containers established in clause H-6 of the government's Master Lease with TOPtainer.  Textainer I, 99 Fed. Cl. at 221.  With regard to the measure of the pre-judgment interest rate, the court held that, absent "special proof," it would apply the Declaration of Taking Act interest rate ("DTA rate"), based on the weekly average one-year constant maturity Treasury yield, id. at 221-23 (quoting the Declaration of Taking Act, 40 U.S.C. § 3116 (2006)), if a taking were established.

the subject containers.  Id. at 2, Ex. E.  Capital asked that all containers in the government's possession belonging to Capital be returned to Capital.  Id., Ex. E.

In light of this new evidence, the court agreed to postpone the trial and accept renewed motions.  In their renewed motion plaintiffs argued, based on the above-cited undisputed facts, that the government had acted in its sovereign capacity and effected a taking when it took "title" to plaintiffs' containers after receiving notice from Capital that TOPtainer was in default of its contracts with Capital and when the government kept many containers it knew were never lost.[2]

The government filed its cross-motion for summary judgment arguing that, despite Capital's notice of TOPtainer's default, the government took lawful title to the subject containers because it was simply acting as a "buyer in the ordinary course" under the Uniform Commercial Code.  According to the government, it was acting in its proprietary capacity under its contract with TOPtainer when it bought plaintiffs' containers and thus there had not been a taking within the meaning of the Fifth Amendment.  The government also argued in relevant part that Textainer did not have standing to bring its takings claim because it only managed, and never owned, the 477 containers for which it was seeking compensation.  The government further argued that any transfer of Capital's

---

[2] Plaintiffs also sought sanctions against the government for failing to timely reveal that the Capital containers sent to Okinawa, Japan were never lost.  Pls.' Mot. for Sanctions, ECF No. 94.  Plaintiffs also asked in their renewed summary judgment motion that the court reconsider its ruling regarding the DTA rate and find that the proper interest rate to apply in determining a just compensation award is the rate set forth in the Contract Disputes Act.  Pls.' Renewed Mot. at 21, ECF No. 91.  Plaintiffs alternatively argue that the court should apply the Moody's AAA long term rate.  See Pls.' Resp. in Support of Joinder at 17, ECF No. 140.

takings claim to Textainer violated the Anti-Assignment Act, which prohibits the assignment of claims against the United States.

In response, Textainer did not dispute that it never owned the containers for which it was seeking compensation, and instead claimed that it brought this suit on behalf of Capital's successor-in-interest, Green Eagle Investments ("Green Eagle"). Textainer alleged that Capital ceased to exist when Green Eagle, a company located in the Netherlands Antilles, purchased 100% of Capital's stock pursuant to a 2007 stock purchase agreement ("SPA") and that, under the SPA, Capital's takings claim was transferred to Green Eagle. Based on these facts, Textainer argued that Green Eagle could either ratify or join this action as the real party in interest to Textainer's takings claim under Rule 17 of the Rules of the United States Court of Federal Claims ("RCFC").

In its second summary judgment opinion, issued on November 6, 2012, the court joined Green Eagle as the real party in interest to Textainer's takings claim. Textainer II, 2012 WL 5465983 at *5. However, the court stayed consideration of whether Green Eagle had standing to bring Capital's takings claim or whether the transfer of Capital's claim to Green Eagle violated the Anti-Assignment Act until further discovery was conducted.[3] Id. at *14.

Turning to CAI's and Cronos' claims, the court held that a determination of whether the government acted in its sovereign rather than its proprietary capacity when it took title to CAI's or Cronos' containers—and therefore whether a taking occurred—

---

[3] The court also stayed consideration of the interest rate issue and the plaintiffs' motion for sanctions.

depended on whether the government knew that TOPtainer no longer had any rights over CAI's or Cronos' containers when the government took title to those containers. See Armstrong v. United States, 364 U.S. 40, 48-49 (1960); J.J. Henry Co. v. United States, 411 F.2d 1246, 1250 (Ct. Cl. 1969). The court determined that, under the terms of the Master Lease, title to plaintiffs' containers transferred when plaintiffs' containers were "deemed lost" by the government. Textainer II, 2012 WL 5465983 at *11. While the parties did not dispute that Capital had notified the government of TOPtainer's default before the government took title to Capital's containers, the court held that neither CAI nor Cronos had notified the government of TOPtainer's default before title to their containers transferred. Id. at *11-14. The court determined that, without notice, the government had acted within its contract rights as a "buyer in the ordinary course" and that CAI and Cronos could not rely on Capital's notice to the government to support their claims. Id. The court therefore granted summary judgment in favor of the government for CAI's and Cronos' takings claims.[4] Id. Thus, following the court's second summary judgment opinion, the only remaining takings claim in this case belonged to Green Eagle.

### C. The pending motion to ratify or join Capital as the real party in interest.

Following a period of discovery, the parties submitted supplemental briefing on Green Eagle's takings claim. In its briefs, Green Eagle for the first time indicated that it had located evidence that Capital had not been dissolved but still existed as a wholly-owned subsidiary of Green Eagle located in Rotterdam, The Netherlands. Green Eagle

---

[4] The court also found that Cronos lacked standing to bring a takings claim for some of its containers.

7

argued that Capital is a shell entity that is still in the process of winding down and "has no operations, no employees, no assets, no contingent claims, no receivables, and performs no business functions." Pls.' Supplemental Mot. at 6, ECF No. 130. Instead, Green Eagle asserted that under the terms of the SPA, Green Eagle assumed control over every asset and business function formerly owned by Capital, including its takings claim against the government. The government argued in its supplemental briefs that, as a matter of black letter corporate law, because Capital still exists as a corporate entity, Capital alone continued to own its takings claim and therefore remains the sole party that may bring the takings claim.

After briefing was complete, Green Eagle submitted the affidavit of Jacob Versnel, the sole remaining director of Capital Lease Limited, to the court. Versnel Aff., ECF No. 137-1. Mr. Versnel confirmed that Capital is "a non-operating, dormant entity that has no employees or business functions." Id. ¶ 4. Mr. Versnel stated that "in the event that the Court determines that it is necessary that Capital Lease Limited ratify the actions of Green Eagle on its behalf to establish standing, I hereby express Capital Lease Limited's consent to such ratification. In doing so Capital Lease Limited expressly agrees to be bound by all prior and future court rulings with respect to the claim for compensation for the containers owned by Capital Lease Limited at the time of the taking in 2004." Id. ¶ 6. Mr. Versnel also indicated that Capital was not opposed to being named a plaintiff in this action, although he believed that such an action was not necessary given the terms of the SPA. Id. ¶ 7.

At the oral argument on the supplemental briefing, plaintiffs moved to ratify or join Capital as the real party in interest in this case. The government asked for time to respond and in its latest pleadings opposes this motion. In its opposition, the government argues that plaintiffs' motion to ratify or join Capital should be denied because plaintiffs previously represented that Capital no longer existed and that Green Eagle was the proper real party in interest. Because of these inaccurate statements, the government argues that plaintiffs' failure to bring this suit in Capital's name was not the result of an "understandable mistake" required by RCFC 17. The government further contends that Green Eagle could have easily determined that Capital still existed, and that plaintiffs should not now be rewarded for this oversight by allowing Capital to join the lawsuit at such a late date.

The government alternatively argues that plaintiffs should be judicially estopped from substituting Capital into this action. The government contends that plaintiffs have put forward inconsistent positions by first claiming that Capital does not exist and persuading the court that Green Eagle was the real party in interest, and now attempting to substitute Capital as a plaintiff. This, the government argues, placed an unfair detriment on the government because the United States has wasted resources in conducting discovery of Textainer and Green Eagle. In addition, the government argues that it would be severely prejudiced if the court allows Capital to be substituted for Green Eagle without allowing the government to conduct discovery of Capital.

Plaintiffs argue in response that joining Capital under RCFC 17 serves the fundamental purpose of the rule by ensuring res judicata effect of the judgment regarding

Capital's takings claim. Plaintiffs assert that the underlying facts of Capital's outstanding takings claim would not change if Capital were ratified or joined as the real party in interest. Plaintiffs further argue that the government knew that Capital was the owner of the containers from the start of this lawsuit, that plaintiffs did not make intentionally misleading or inconsistent statements regarding Capital's corporate status before the court, and that plaintiffs promptly moved for joinder of Capital once they learned that Capital had not completely dissolved and thus, while a "shell," remained the potential real party in interest. Thus, plaintiffs argue, they will not receive an unfair advantage if Capital is joined, and, because the government has had access from the outset of discovery to all of Capital's records, the government will not be prejudiced by joinder.

Briefing on the motion to ratify or join was completed on April 26, 2013. The court now turns to the parties' arguments.

## II.     DISCUSSION

### A.     Joining Capital as the real party in interest is consistent with RCFC 17.

Under RCFC 17(a)(1), an "action must be prosecuted in the name of the real party in interest." The "real party in interest is one who has a real, actual, material or substantial interest in the subject matter of the action." Haddon Hous. Assocs., LLC v. United States, 92 Fed. Cl. 8, 15 (2010) (quotations omitted). RCFC 17(a)(3) provides that "[t]he court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real

10

party in interest." The joinder or substitution of the real party in interest relates back for limitations purposes to the date of the original pleading. Holland v. United States, 62 Fed. Cl. 395, 401 (2004).

It is well-settled that "courts should be lenient in permitting ratification, joinder, or substitution" of the real party in interest. First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279, 1289 (Fed. Cir. 1999); see also Fed. R. Civ. P. 17 advisory committee's note to the 1966 amendment (discussing the analogous federal rule and stating that "[m]odern decisions are inclined to be lenient when an honest mistake has been made in choosing the party in whose name the action is to be filed"). The rule is "intended to prevent forfeiture when determination of the proper party to sue is difficult or when an understandable mistake has been made." Fed. R. Civ. P. 17 advisory committee's note to the 1966 amendment. The primary purpose of RCFC 17 is to "protect defendants from multiple liability in actions by subsequent claimants and also to ensure that the judgment in the action will have res judicata effect." Sys. Fuels, Inc. v. United States, 65 Fed. Cl. 163, 170 (2005) (citing 4 Daniel R. Coquillette et al., Moore's Federal Practice § 17.10 (3d ed. 2004) (discussing the analogous federal rule)).

After consideration of the parties' arguments, the court grants plaintiffs' motion for joinder of Capital Lease Limited as a party to this lawsuit. When considering whether to grant plaintiffs' motion, the court is guided primarily by the text of RCFC 17 and the Federal Circuit's interpretation of the rule. Sys. Fuels, 65 Fed. Cl. at 171. As noted, the Federal Circuit directs that the court should be lenient in permitting joinder under RCFC 17. First Hartford, 194 F.3d at 1289. Courts have also considered such factors as

11

whether the defendant will be prejudiced by the joinder, whether the factual allegations of the complaint will change, and whether the defendant is aware of the relevant parties. See, e.g., Holland, 62 Fed. Cl. at 401-02 (citations omitted); but see Sys. Fuels, 65 Fed. Cl. at 171 (explaining that these standards correlate to relation-back principles addressed by RCFC 15).  The government argues that an "honest mistake" or "understandable mistake" is also required for joinder under RCFC 17.  Some courts discuss understandable or honest mistake as a factor in their Rule 17 analysis, while others conclude that joinder as a real party in interest is proper without determining whether there has been an understandable mistake.  See Holland, 62 Fed. Cl. at 401.

   Tested by these principles, including the lenient standard outlined by the Federal Circuit, the court finds that joinder of Capital is appropriate in this case.  Joinder serves the fundamental purpose of RCFC 17 in protecting the government "from multiple liability in actions by subsequent claimants and also [in] ensur[ing] that the judgment in the action will have res judicata effect."  Sys. Fuels, 65 Fed. Cl. at 170 (citation and quotation omitted).  Specifically, joining Capital in this case ensures that the United States will not be subject to multiple suits based on Capital's takings claim.  In addition, the court finds that determining the real party in interest in this case has been difficult.  This case involves international corporations with convoluted corporate structures which are subject to the laws of various jurisdictions, making the determination of ownership of the subject containers after the sale to Green Eagle complicated.  As such, plaintiffs' errors in identifying the real party in interest are understandable and do not justify outright denial of plaintiffs' motion.  The record demonstrates that plaintiffs have never

"hidden the ball," but have promptly corrected their errors in identifying the real party in interest in this case and promptly moved for joinder of Capital once the relevant facts regarding its continued corporate existence came to light. The government has not provided any evidence that plaintiffs' failure to initiate this action in Capital's name was due to an intentional manipulation of RCFC 17.

In addition, joinder of Capital under RCFC 17 will not enlarge the facts or nature of the government's liability in this case. The scope of Capital's takings claim and its underlying facts remain the same if Capital is substituted as the real party in interest rather than Green Eagle or Textainer. Most importantly, the government has been aware of Capital's interest in the containers from the beginning of this action. Textainer identified itself as Capital's successor-in-interest at the start of this case, and the government did not raise any objections to the real party in interest status of Textainer until years into this litigation. In such circumstances, the court finds that joining Capital as the real party in interest comports with RCFC 17.[5]

### B. Plaintiffs are not judicially estopped from joining Capital under RCFC 17.

Having concluded that joining Capital comports with RCFC 17, the court now turns to whether plaintiffs should be judicially estopped from substituting Capital into

---

[5] The government asserts that had it known that Capital was still in existence it would have pursued discovery into whether the government has a False Claims Act counterclaim against Capital due to an email that suggests that TOPtainer and Capital had discussed a scheme for making false claims. See Def.'s Renewed Cross-Mot. at 22-24, ECF No. 97. The court is not persuaded that learning of Capital's existence has changed anything in this regard. The government could have pursued this line of discovery once it learned of Green Eagle's existence. Nonetheless, to avoid any possible prejudice to the government, the court will allow limited discovery into Capital's possible wrongful behavior. See Part III, infra.

this action. Under the equitable doctrine of judicial estoppel, "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (quoting Davis v. Wakelee, 156 U.S. 680, 689 (1895)). There is no "precise formula" governing the application of judicial estoppel. First Annapolis Bancorp, Inc. v. United States, 89 Fed. Cl. 765, 803 (2009). However, as explained by the Federal Circuit, certain factors guide the court's decision:

> The determination of whether a party's inconsistent legal positions constitute judicial estoppel is informed by three factors, which the Supreme Court did not intend to be exclusive: (1) whether the "party's later position [is] 'clearly inconsistent' with its earlier position"; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled'"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."

Trs. in Bnkr. of N. Am. Rubber Thread Co. v. United States, 593 F.3d 1346, 1354 (Fed. Cir. 2010) (quoting New Hampshire, 532 U.S. at 750-51). The decision whether to invoke judicial estoppel lies within the court's discretion. New Hampshire, 532 U.S. at 750.

The government asks the court to invoke judicial estoppel of Capital's joinder based on plaintiffs' previous claims that Capital no longer existed. Compare July 10, 2012 Aff. of Willem de Bruijn ¶ 5, ECF No. 114-2 ("As a result of the [stock purchase

agreement,] Capital Lease Limited no longer exists."), with January 24, 2013 Second Aff. of Willem de Bruijn ¶ 2, ECF No. 130-2 ("Capital Lease and all its subsidiaries ceased all independent operations at [the time of the stock purchase agreement.]").  The government contends that plaintiffs benefited by persuading the court to substitute Green Eagle for Textainer based on Capital's non-existence, and they should now be judicially estopped from substituting Capital as a plaintiff in this case.

Plaintiffs argue in response that the doctrine of judicial estoppel is inapplicable in this case because they have not taken inconsistent positions, they have not gained any advantage from any alleged inconsistency, and the government has shown no prejudice suffered from the alleged inconsistency.  In particular, plaintiffs contend that the statement of the Managing Director of Green Eagle, Willem de Bruijn, that Capital ceased to exist should be taken in context.  Plaintiffs argue that this statement was made to indicate that Capital ceased operations after all of its stock was purchased by Green Eagle.  Plaintiffs assert that, to extent that this statement was inaccurate, this error was unintentional.  Moreover, plaintiffs contend that they have not hidden Capital's status, but believed it had been subsumed by Green Eagle, only to learn that a sole director remains responsible for overseeing Capital during its liquidation and wind down process. Plaintiffs further argue that the United States will suffer no prejudice because the government knew of Capital's existence from the beginning of this lawsuit.

For many of the same reasons as discussed above, the court finds that judicial estoppel should not bar Capital from joining this lawsuit.  As noted above, given the complicated structure of plaintiffs' industry, including the foreign entities involved, the

court will not penalize plaintiffs for previously stating that Capital ceased to exist upon the sale of 100% of its stock to Green Eagle. Plaintiffs' statements have not been clearly inconsistent with their current position regarding Capital's corporate status that Capital in fact ceased to conduct any independent operations and that instead all of its former operations are run by Green Eagle. In addition, the government has not presented any evidence that plaintiffs are seeking to gain an unfair advantage in now asserting that Capital continues to exist as a corporate entity and should be joined as the real party in interest here. Rather, plaintiffs' current request reflects a better understanding of the facts of the complicated corporate relationship between Capital, Green Eagle, and the original plaintiff in this case, Textainer. Finally, in order to mitigate any prejudice or unfair detriment to the government, the court will allow the government to conduct limited discovery into Capital and its possible counterclaim. See supra note 5.

### III.   CONCLUSION

For the reasons set forth above, the court **GRANTS** plaintiffs' oral motion to join Capital Lease Limited. The parties shall have until **July 17, 2013** to conduct limited discovery into Capital's takings claim and the government's possible False Claims Act counterclaim. Upon completion of discovery, the parties shall submit a status report by **July 24, 2013**, outlining next steps in this litigation. The court **STAYS** ruling on the parties' supplemental cross-motions for summary judgment as to Capital's takings claim, on plaintiffs' motions for sanctions, and on the proper interest rate pending the completion of the discovery period.

**IT IS SO ORDERED**.

                                                s/Nancy B. Firestone
                                                NANCY B. FIRESTONE
                                                Judge