# In the United States Court of Federal Claims

No. 08-610C
(Filed: April 22, 2014)

| | |
|---|---|
| TEXTAINER EQUIPMENT MANAGEMENT LIMITED, et al., | Standing To Bring Takings Claim; Assignment of Claims Act; Subrogation; RCFC 17 Substitution; Physical Possession and Use for Public Purpose; Interest on takings claim |
| Plaintiffs, | |
| v. | |
| THE UNITED STATES, | |
| Defendant. | |

*Lars H. Liebeler*, Washington, DC, for plaintiffs.

*Robert C. Bigler*, Civil Division, United States Department of Justice, Washington, DC, with whom were *Stuart F. Delery*, Assistant Attorney General, *Bryant G. Snee*, Acting Director, and *Franklin E. White, Jr.*, Assistant Director, for defendant.

## O P I N I O N

**FIRESTONE**, *Judge.*

This is the court's fifth decision in this case.[1]  Previously, the court determined that the government's decision to take title and possession of shipping containers that the government had leased from TOPtainer Container Management & Sales ("TOPtainer"),[2] but were owned by plaintiff, Capital Lease Limited ("Capital"), gave rise to a potential

---

[1] Previous decisions in this case are Textainer Equip. Mgmt. Ltd. v. United States, No. 08-610, 2013 WL 1984382 (Fed. Cl. May 15, 2013); Textainer Equip. Mgmt. Ltd. v. United States, No. 08-610, 2012 WL 5465983 (Fed. Cl. Nov. 6, 2012); Textainer Equip. Mgmt. Ltd. v. United States, 105 Fed. Cl. 69 (2012); Textainer Equip. Mgmt. Ltd. v. United States, 99 Fed. Cl. 211 (2011).

[2] TOPtainer is no longer in business.  See Textainer, 2013 WL 1984382, at *1.

taking of property without just compensation in contravention of the Fifth Amendment to the U.S. Constitution. Textainer, 2012 WL 5465983, at *8. Specifically, the court found that the government's decision to take title to and possession of plaintiffs' shipping containers which the U.S. military used in Iraq gave rise to a taking because the government knew the containers belonged to Capital but elected to keep the containers for military use[3] without paying Capital.[4] Id. Although the court found the government liable for a taking of Capital's containers, the court denied summary judgment on the grounds that there were disputed facts as to whether Capital owned all of the 477 containers Capital claimed were taken by the government.

Until this final round of briefing, the actual ownership status of many of the containers has been unclear.[5] However, after discovery, plaintiff Green Eagle Investments N.V. ("Green Eagle"), Capital's successor, entered into a series of

---

[3] After the filing of the complaint, it was determined that 122 of these containers were in use by the United States Marine Corps in Okinawa, Japan. Textainer, 99 Fed. Cl. at 216.

[4] As discussed below, the court determined that the government's decision to take title to and possession of plaintiffs' containers despite Capital's notice that it owned the containers and wanted them returned was a sovereign act. The court found that it was that notice that distinguished Capital's takings claim from other plaintiffs that were dismissed because those other plaintiffs had not provided the government with notice. The court concluded that the government had not taken the containers of those other plaintiffs because without notice the government could claim that it was a bona fide purchaser for value of those containers. Textainer, 2012 WL 5465983, at *5-14.

[5] Plaintiffs have had an extremely difficult time determining the proper party to bring its claim. Textainer is the name of the leasing company that took control of Capital's containers after Capital merged with Green Eagle. Until recently, plaintiff argued that Green Eagle was Capital's successor and the only surviving entity of the Capital merger. Then, Green Eagle notified the court that Capital was still in existence, though it was a shell entity in the process of winding down. Textainer, 2013 WL 1984382, at *3. Thus, Capital has been substituted as the real party in interest along with its successor, Green Eagle.

stipulations with United States regarding the ownership and value of the subject 477 containers. These stipulations are summarized as follows: (1) Capital owned 258 containers at the time of the taking at a value of $485,899.64; (2) Capital Lease GmbH ("GmbH"), a wholly-owned subsidiary of Capital, owned 22 containers at the time of the taking at a value of $33,496.87; (3) P&R Equipment and Finance Corporation ("P&R") owned 197 containers at the time of the taking at a value of $219,024.99; (4) Capital purchased 99 of P&R's containers, with a value of $153,250.57, after the date of the taking as part of several larger transactions that resulted in Capital buying 95,441 containers from P&R between 2005 and 2007; (5) Green Eagle, as the successor to Capital, purchased 98 of P&R's containers, with a value of $218,024.99, after the date of the taking as a part of a transaction involving its purchase of 35,814 additional containers in 2009. Jt. Stip., ECF No. 157, at 1-3.

Pending before the court are plaintiffs' motion for summary judgment and the government's cross-motion for summary judgment under Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). Plaintiff seeks to establish ownership and, thus, just compensation for all 477 containers in the amounts claimed above together with interest based on the Moody's Composite Index of Yields on Aaa Long Term Corporate Bonds ("Moody's Rate") from the date of the taking. The government seeks a ruling that Capital is not entitled to just compensation for any of the 477 containers, and that interest, if established, should be limited to the rate under the Declaration of Takings Act ("DTA"), 40 U.S.C. § 3116.

For the reasons that follow, the court finds that plaintiffs are entitled to summary judgment with regard to their claim for just compensation for the 258 containers owned by Capital at the time of the taking in the amount of $485,899.64 with interest as set forth below and that the government is entitled to summary judgment with regard to all remaining claims.[6]

## I.   STANDARD OF REVIEW

Under RCFC 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). The court's task is to determine whether a genuine issue of material fact exists, and not "to weigh the evidence and determine the truth of the matter . . . ." Anderson v. Liberty Lobby, 477 U.S. 242, 249 (1986). As it does for all RCFC 56 motions, the court views the evidence in a light most favorable to the nonmoving party, drawing reasonable inferences in its favor. See Schooner Harbor Ventures, Inc. v. United States, 569 F.3d 1359, 1362 (Fed. Cir. 2009); Galvin v. Eli Lilly & Co., 488 F.3d 1026, 1031 (D.C. Cir. 2007). If the court finds that a rational trier of fact could not find for the nonmoving party, then there is no genuine issue for trial and the movant is entitled to summary judgment. Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita Elec. Industr. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## II.   DISCUSSION

---

[6] The court has held several oral arguments in this case and has concluded that an additional argument on the present motions for summary judgment is not warranted.

**A.    Capital and Green Eagle Lack Standing to Maintain a Takings Claim for Containers Owned by P&R and GmbH**

The elements for establishing a takings claim under the Fifth Amendment are well-settled and are not disputed by the parties.  The court first must determine whether the claimant has established a property interest for purposes of the Fifth Amendment.  Klamath Irr. Dist. v. United States, 635 F.3d 505, 511 (Fed. Cir. 2011).  If a property interest is established, the court then must determine whether all or a part of that interest has been appropriated by the government for a public use.  Id.  Put another way, the government's actions must appropriate a benefit for the government at the expense of the property owner.  Moden v. United States, 404 F.3d 1335, 1339 (Fed. Cir. 2005) (quoting Ridge Line v. United States, 346 F.3d 1346, 1356 (Fed. Cir. 2003)).

The government does not dispute that Capital and Green Eagle have standing to assert a claim in connection with the 258 containers Capital owned at the time the government took title.  Instead, the government argues that the United States did not engage in sovereign conduct when it elected to keep Capital's containers.  However, the government does challenge plaintiffs' standing to seek compensation for the 197 containers that were owned by P&R on the date of taking and the additional 22 containers that were owned by Capital's subsidiary, GmbH, on the date of taking.  The court will first examine the government's standing arguments with regard to containers owned by P&R and GmbH before turning to the argument regarding plaintiffs' containers and, finally, the issue of the proper interest rate to apply.

**1.    P&R Containers**

With respect to the 197 containers owned by P&R, the government argues that neither Capital nor Green Eagle has standing to seek just compensation because neither owned the containers at the time of the taking, citing United States v. Dow, 357 U.S. 17, 20-21 (1958), for the proposition that just compensation is due at the time of the taking to the owner at that time, not an owner at an earlier or later date.  The government argues that, to the extent that plaintiffs contend they acquired P&R's claim for just compensation for the 197 containers when they later purchased those containers, their claim is barred by the Assignment of Claims Act. [7]

---

[7] Two anti-assignment statutes restrict the manner in which private entities may voluntarily assign contracts with, and claims against, the government.  These two statutes are often referred to collectively as the "Assignment of Claims Act" or the "Anti-Assignment Acts," and are codified at 41 U.S.C. § 15 and 31 U.S.C. § 3727.  Delmarva Power & Light Co. v. United States, 542 F.3d 889, 892 (Fed. Cir. 2008); Fireman's Fund Ins. Co. v. England, 313 F.3d 1344, 1349 (Fed. Cir. 2002).  The statute applicable here is 31 U.S.C. § 3727, the Assignment of Claims Act.  The Act provides, in relevant part:

(a)  In this section, "assignment" means—

(1)  a transfer or assignment of any part of a claim against the United States Government or of an interest in the claim; or

(2)  the authorization to receive payment for any part of the claim.

(b)  An assignment may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued.  The assignment shall specify the warrant, must be made freely, and must be attested to by 2 witnesses.  The person making the assignment shall acknowledge it before an official who may acknowledge a deed, and the official shall certify the assignment.  The certificate shall state that the official completely explained the assignment when it was acknowledged.  An assignment under this subsection is valid for any purpose.

31 U.S.C. § 3727(a)-(b).

Plaintiffs do not dispute that they did not own the containers at the time of the taking and do not dispute that they do not have a claim authorized under the Assignment of Claims Act.  Rather, they argue that they have standing to seek just compensation on two grounds.  First, plaintiffs argues that they were subrogated to P&R's just compensation claim and, for that reason, the claim is exempt from the Assignment of Claims Act.  Second, they argue on policy grounds that the Assignment of Claims Act does not apply to this case.

### a.        Plaintiffs Are Not Subrogated to P&R's Claims

Plaintiffs argue that their claims for just compensation are subrogation claims under the contract between Capital and P&R—the contract that allowed Capital to lease P&R's containers to TOPtainer, and for TOPtainer to then lease those containers to the government.  Under those contracts, Capital had assumed the risk of loss of P&R's containers, was required to buy insurance for the containers, and eventually was required to buy all of P&R's containers, including those taken by the government at the end of the lease term.  According to plaintiffs, this contractual arrangement with P&R effectively subrogated them to P&R's claim for just compensation.  Because subrogation claims are ordinarily exempt from the Assignment of Claims Act, plaintiffs argue, their claims are exempt from the Assignment of Claims Act.  In support of this argument, plaintiffs rely on United States v. Aetna Cas. & Sur. Co., 338 U.S. 366 (1949), and Saint John Marine Co. v. United States, 92 F.3d 39 (2d Cir. 1996).[8]

---

[8] In Aetna, the Supreme Court held that the insurance company that paid a tort victim harmed by the United States became equitably subrogated to the victim's tort claim against the government.

The court agrees with the government that plaintiffs' contractual arrangement with P&R did not effectively subrogate Capital to P&R's claim for just compensation.  While the Supreme Court and other courts have recognized exemptions to the Assignment of Claims Act, these exemptions are very narrow and do not extend to the facts of this case. In Dow, the plaintiff acquired property after it had been condemned and physically occupied—but before a formal declaration of taking had been filed—and thereafter brought a claim for just compensation.  Addressing the question of whether the claim for just compensation vested in the owner at the time the United States took possession of the property or when the government filed a formal declaration of taking, the Supreme Court held that a claim for just compensation based on the voluntary acquisition of property previously taken by the government can only give rise to a claim by the subsequent purchaser if that purchaser satisfies the requirements under the Assignment of Claims Act.  Dow, 357 U.S. at 20-21.  The Court determined that the claim for just compensation vested when the government took possession and thus the taking claim belonged to the property owner at the time of the take.  Id. at 20 ("[I]t is undisputed that '(since) compensation is due at the time of taking, the owner at that time, not the owner at an earlier or later date, receives payment.'" (quoting Danforth v. United States, 308 U.S. 271, 284 (1939)); see also Palazzolo v. Rhode Island, 533 U.S. 606, 628 (2001) (citing

---

Because the assignment occurred by operation of law, the Supreme Court held that the Assignment of Claims Act did not apply.  In Saint John Marine, the Second Circuit relied on Aetna to hold that a lien created by a maritime agreement served to assign a claim against the United States without triggering the Assignment of Claims Act.  Both cases turn on assignments that arise from independent legal relationships, i.e., by operation of law.  Plaintiffs argue that the same principle should apply here.

Danforth, 308 U.S. at 284).  Applying those principles to this case, the court finds that, absent an exception, plaintiffs' claims based on P&R's containers are barred by the Assignment of Claims Act.

In this regard, the court agrees with the government that plaintiffs are not entitled to an exemption from the Assignment of Claims Act based on their agreement with P&R. Because plaintiffs did not take on the legal obligation to pay just compensation in the event of a taking, plaintiffs are not subrogated to P&R's taking claim.  Although plaintiffs had the opportunity to include a provision covering such takings in the agreement with P&R, they did not do so.  Without such a provision, there is no mechanism for the assignment of a taking claim through operation of law, regardless of whether Capital assumed the risk of loss and acquired insurance to cover losses.  In Dow, the court noted that "There were readily available contractual means by which he could have protected himself vis-a-vis his grantors against the contingency that his claim against the United States would be subsequently invalidated by the Anti-Assignment Act."  Dow, 357 U.S. at 27.  For example, in the present case, plaintiffs could have negotiated for P&R to pursue the takings claim against the government and to then pay over the funds to plaintiffs.  However, because they did not do so, the Assignment of Claims Act bars plaintiffs from recovering for the containers owned by P&R at the time of the taking. [9]

_____

[9] If plaintiffs are instead arguing that they are subrogated to P&R's claims for a tort committed by the government in keeping the containers, that claim is outside the jurisdiction of this court. See 28 U.S.C. § 1491(a)(1) (The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim . . . not sounding in tort.").

**b.      Policy Is Broader Than Plaintiffs Claim**

Plaintiffs further argue that, because the Assignment of Claims Act is fundamentally a statute designed to protect the United States from fraud, claim trafficking, and potential conflicting claims, finding an exemption is appropriate in this case because it will not undermine the fundamental purpose of the Act.  According to plaintiffs, their purchase of P&R's taken containers as part of a pre-existing agreement entered into before the taking does not implicate the policy concerns that the Act is designed to address.  Thus, they argue on policy grounds that there is no reason to apply the Assignment of Claims Act.

The government disagrees, arguing that the Assignment of Claims Act not only applies but that the policy concerns of the Act are broader than plaintiffs claim. Specifically, the government argues that, as discussed in <u>Kingsbury v. United States</u>, 563 F.2d 1019, 1024 (Ct. Cl. 1977), the Assignment of Claims Act preserves for the government defenses and counterclaims which might not be available against the assignee, and therefore the United States is also protected from a loss of those defenses and counterclaims.

Plaintiffs' contention that their claim should be exempt from the Assignment of Claims Act on policy grounds, regardless of whether subrogation applies, is unpersuasive.  While it is no doubt true that the Assignment of Claims Act is intended, in the first instance, to protect the government from fraud, conflicting claims, and potential liability to multiple parties, those are not the only reasons for its application.  Among the reasons for precluding the transfer of takings claims is the concern that different defenses

may apply depending upon who owns the property on the date of taking. United States v. Shannon, 342 U.S. 288, 292 (1952) (quoting Grace v. United States, 76 F. Supp. 174, 175 (D. Md. 1948)); see also Palazzolo, 533 U.S. at 628 ("A blanket rule that purchasers with notice have no compensation right when a claim becomes ripe is too blunt an instrument to accord with the duty to compensate for what is taken."). Thus, one party cannot simply step into the shoes of another when seeking just compensation for property belonging to another on the date of the taking.[10]  The Assignment of Claims Act's legitimate policy goal of preserving defenses is therefore furthered by applying the Act here.  Plaintiffs' claims for just compensation in connection with P&R's containers must therefore be **DENIED**.

### 2.    Capital Lease GmbH Containers

With respect to the 22 containers owned by GmbH, the government argues that plaintiffs lack standing to bring claims for just compensation, as with the containers owned by P&R.  Plaintiffs argue in response that they should have standing on two grounds.  First, they argue that, as the sole stockholder of GmbH, they own the assets of GmbH and may step into its shoes as its alter ego.  Second, plaintiffs argue that, if they

---

[10] For example, while the court need not resolve the question at this time, P&R may not actually be entitled to state a takings claim on its own behalf in the first instance.  Capital gave notice to the government that TOPtainer did not own its containers and thus could not sell them, but there is no evidence that P&R gave such notice to the government.  In such circumstances, P&R likely would not be entitled to state a taking claim on its own behalf, and the government could be prejudiced by allowing plaintiffs to bring those claims as their own.  This is especially true in a case such as this, where the notice provided to the government is a critical factor in establishing liability.  As a result, plaintiffs may simply be wrong in assuming that P&R has a right to just compensation.

may not bring GmbH's claims, GmbH itself should be permitted to join this litigation under RCFC 17.

### a.      Plaintiffs Do Not Own GmbH's Assets

The government argues that plaintiffs do not have standing to pursue a takings claim with respect to the 22 containers that were owned by GmbH because, although Capital is a stockholder in GmbH, GmbH is a separate legal entity distinct from Capital. As a result, the government argues, Capital cannot be presumed to have owned the containers belonging to GmbH at the time of the taking, citing Dole Food Co. v. Patrickson, 538 U.S. 468, 474-75 (2003), for the general rule that two separate corporations are regarded as distinct legal entities even if the stock of one corporation is owned wholly by the other and that the parent cannot be presumed to have legal title to the assets of the subsidiary solely on this basis.

Plaintiffs argue in response that Capital should be allowed to pursue the claim of its subsidiary because Capital Lease GmbH, as Capital's wholly-owned subsidiary, is in fact the alter ego of Capital and thus Capital may bring a claim on its behalf.  In support, plaintiffs rely on several cases in the Fourth and Tenth Circuits that they argue demonstrate that a wholly-owned subsidiary is an alter ego of the parent for purposes of standing and claim preclusion.[11]  In the alternative, plaintiffs argue that GmbH should be

---

[11]  In Saudi v. V. Ship Switz., the 4th Circuit held that a relationship where the subsidiary is a "mere corporate vehicle" is sufficient to establish privity for purposes of claim preclusion.  93 Fed. App'x 516, 520-21 (citing Robinson v. Volkswagenwerk AG, 56 F.3d 1268, 1275 (10th Cir. 1995); Whitehead v. Viacom, 233 F. Supp. 2d 715, 721 (D. Md. 2002); Buckley v. Airshield Corp., 977 F. Supp. 375, 378-79 (D. Md. 1997)).  In Robinson, the 10th Circuit held that a controlling, "near alter ego" relationship was sufficient to establish privity for purposes of claim

allowed to join this suit pursuant to RCFC 17 as the real party in interest for the 22 containers if it is found to be the owner.

The court agrees with the government that Capital does not have standing to seek compensation because, as a corporate parent, it cannot be presumed to own Capital Lease GmbH's assets and thus does not own the 22 containers belonging to GmbH. There is simply no evidence before the court to allow the court to find that Capital's ownership of GmbH's stock alone made Capital the owner of the 22 containers. Plaintiffs' reliance on cases showing wholly-owned subsidiaries as alter egos for the purposes of standing and claim preclusion is misplaced. Parents and their subsidiaries are generally considered to be entirely separate entities, Dole, 538 U.S. at 474 (citing First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 625 (1983)), and plaintiffs have presented no evidence to demonstrate that such a relationship exists here. Because plaintiffs have failed to provide such evidence to demonstrate that GmbH was Capital's alter ego, plaintiffs' cases are unpersuasive. Accordingly, the court sees no reason not to apply the general rule, articulated by the Supreme Court, and find that that shareholder Capital is not presumed to be the owner of GmbH's corporate assets.

### b.     Substitution Under RCFC 17 Is Not Appropriate

Plaintiffs argue that, if GmbH is the real party in interest for these containers, they are permitted an opportunity under RCFC 17 to join them here. Plaintiffs contend that

---

preclusion. 56 F.3d at 1275. While the cases hold that privity between a parent and subsidiary can be demonstrated by an alter ego relationship for purposes of claim preclusion, plaintiffs have presented no evidence that the relationship between Capital and GmbH is actually that of an alter ego.

they were not aware of GmbH's ownership until recently, and thus could not have brought a motion for substitution earlier.  Additionally, plaintiffs argue that permitting GmbH's joinder would not be prejudicial to the government and denying the motion would serve no policy objective.

The government argues in response that plaintiffs' request for substitution under RCFC is not based on an understandable mistake, and that the request comes too late in the litigation to be appropriate.  According to the government, plaintiffs could have settled the ownership issues earlier if they had investigated them, which would have informed them of GmbH's status.  The government contends that plaintiffs' current request is due to plaintiffs' own failures or omissions, and that the court is under no obligation to correct them.

The court agrees with the government that plaintiffs' request to substitute GmbH as the real party in interest under RCFC 17 for the 22 containers comes too late.  Under RCFC 17, "[t]he court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action.  After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest."  RCFC 17(a)(3).  Under this rule, courts must allow a reasonable opportunity for a plaintiff to substitute the real party in interest.  However, "when the determination of the right party to bring the action was not difficult and when no excusable mistake ha[s] been made, then Rule 17(a)(3) is not applicable and the action should be dismissed."  6A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane,

Richard L. Marcus & Adam N. Steinman, Federal Practice and Procedure § 1555 (3d ed.).

As discussed above, the present litigation has been delayed repeatedly by plaintiffs' failure to resolve the issues of ownership.  See supra, note 5.  In this case, plaintiffs have spent much of the last six years identifying various parties that they contend were the real parties in interest.  Finally, in November 2013, plaintiffs, after repeated discovery attempts by the government, informed the court that they had identified GmbH as the owner of these containers.  See Jt. Status Rep., ECF No. 155, at 2.  Even so, plaintiffs waited several months to move for substitution, and even then only did so as an alternative argument.  As a result, this request is simply too late.  As the events in this case occurred nearly a decade ago, permitting plaintiffs to join GmbH here would effectively extend the statute of limitations on the action, placing a greater burden on the government to accommodate plaintiffs' inability to resolve questions of ownership which existed from the outset of this case.  As the court has been given no reason to believe that a timely discovery of the ownership status of the containers was difficult, the court finds no excusable mistake for plaintiffs' failure to join GmbH at a stage of this litigation prior to the third and final round of summary judgment motions.  Plaintiffs' request to join GmbH to the action at this late date is therefore **DENIED** and plaintiffs' claims for just compensation in connection with GmbH's containers must also be rejected.

### B.    The Government Is Liable for a Taking of Capital's Containers

The government next asks that the court reconsider its ruling that the government is liable for a Fifth Amendment taking of the 258 containers actually owned by Capital at the time the government took title and possession of the containers, arguing that the court erred in concluding that the United States acted in a sovereign capacity when it appropriated plaintiffs' property interest.  The government argues that the decision of the United States to take title and possession of Capital's containers after receiving notice from Capital was a proprietary act and that Capital has never identified a sovereign act. The government further argues, relying on <u>Alaska Airlines v. Johnson</u>, 8 F.3d 791, 798 (Fed. Cir. 1993), and <u>DSI Corp. v. United States</u>, 655 F.2d 1072, 1074 (Ct. Cl. 1981), that United States did not take Capital's containers for a public benefit.  As a result, according to the government, the United States cannot be held liable for a taking.

 In this connection, the government also seeks to distinguish this case from <u>Armstrong v. United States</u>, 364 U.S. 40 (1960), where the Supreme Court found a taking in a contractual context.  In <u>Armstrong</u>, the government entered into a contract with a shipbuilder for the construction of Navy personnel boats.  <u>Armstrong</u>, 364 U.S. at 41. The contract provided that, if the shipbuilder defaulted, the United States could terminate the contract, require the shipbuilder to transfer title, and require the shipbuilder to deliver all completed and uncompleted work to the government.  <u>Id.</u>  When the shipbuilder defaulted, the government exercised its right to require it to transfer the boat hulls still under construction to the government.  <u>Id.</u>  At the time of the transfer, the suppliers of the boat materials possessed valid state law liens on the materials.  <u>Id.</u> at 41-42.  However, the suppliers' liens could not be enforced against the United States due to sovereign

immunity. Id. at 42.  As a result, the Court found, the application of sovereign immunity destroyed the liens at issue and caused a compensable taking of the suppliers' liens. Id. at 48-49.

The government argues that Armstrong does not provide any precedent for this case because the government in this case never took valid title from TOPtainer as a bona fide purchaser for value.  The government argues that assertion of control over the containers by the United States was "wrongful," and therefore gives rise only to a claim for conversion of the containers.  In support of this argument, the government relies on State Sav. Bank of Ortley v. United States, 59 Ct. Cl. 621 (1924), in which the Court of Claims held that it lacked jurisdiction to entertain the plaintiff's conversion claim where the Federal Reserve accepted coupon bonds that it had been notified were stolen, and Morgan Guar. Trust Co. v. Third Nat'l Bank, 529 F.2d 1141, 1143 (1st Cir. 1976), which held that a bank that was notified of the owner's claim prior to accepting stolen treasury bills was not a bona fide purchaser and thus was guilty of a conversion.  Based on these cases, the government concludes that, unlike Armstrong, the government in this case has not obtained any property rights that a private company or individual could not obtain and, thus, no taking occurred.

Capital argues in response that the government, by taking physical possession of its property for use by the military, has established a per se taking and that there is no basis for reconsideration of the court's previous determination of taking liability.

The court agrees with Capital and declines the government's invitation to reconsider its earlier ruling.  Regardless of whether the government's actions may also be

characterized as a tort, the critical issue in this case is whether the government is liable

for a taking of property.  Contrary to the government's contention, the fact that the

government's behavior might also give rise to a tort claim does not alter this result.  <u>See</u>

<u>City of Monterey v. Del Monte Dunes at Monterey, Ltd.</u>, 526 U.S. 687, 717 (1999) ("The

city argues that because the Constitution allows the government to take property for

public use, a taking for that purpose cannot be tortious or unlawful.  We reject this

conclusion. . . .  When the government repudiates this duty, either by denying just

compensation in fact or by refusing to provide procedures through which compensation

may be sought, it violates the Constitution.  In those circumstances the government's

actions are not only unconstitutional but unlawful and tortious as well.").  The court finds

that the government is liable for a taking in this case because the government did

appropriate Capital's containers for a public benefit in the form of continued military use.

The principle distinction between a tort and taking relates to the purpose of the

government's action.  A tort is intended to remedy an injury to property without regard to

public benefit.  <u>See</u> <u>Ridge Line</u>, 346 F.3d at 1355 (discussing distinction between a taking

and a tort).  A taking, in contrast, turns on whether the government has acted for a public

benefit.  <u>Moden</u>, 404 at 1342 (citing <u>Ridge Line</u>, 346 F.3d at 1356).  Here, the undisputed

facts demonstrate that the government decided to keep Capital's containers for a public

purpose.  First, when the United States continues to physically occupy and use property

after a lease expires, a taking occurs.  <u>See</u> <u>Prudential Ins. Co. of Am. v. United States</u>,

801 F.2d 1295, 1300 n.13 (Fed. Cir. 1986) (citing <u>Kimball Laundry Co. v. United States</u>,

338 U.S. 1 (1959); <u>United States v. General Motors Corp.</u>, 323 U.S. 373 (1945)).

Second, military conduct that appropriates private property for its use is recognized as giving rise to a taking.  See Argent v. United States, 124 F.3d 1277, 1281 (Fed. Cir. 1997).  Here, the United States decided to keep and use the containers belonging to Capital past the end of its lease without just compensation and did so for a military use, satisfying the requirement of a public purpose.[12]  The fact that the government was initially acting in a proprietary capacity when it paid TOPtainer for the containers belonging to Capital does not convert the government's decision to keep those same containers after Capital notified it that TOPtainer had no right to sell the containers and sought their return into a proprietary act.  As a result, the government is liable for taking plaintiffs' containers for a public use and the court declines the opportunity to reconsider its prior opinions.

> **C.    A Combination of the Declaration Of Takings Act Rate with the Moody's Rate Is the Correct Interest Rate**

When the court first considered the issue of interest, the court held that the interest rate under the DTA,[13] rather than the Moody's Rate, was likely the correct interest rate because the plaintiffs failed to provide any evidence to support the application of the Moody's Rate.  Textainer, 99 Fed. Cl. at 223.  Since that time, plaintiffs have argued that the DTA rate alone is not sufficient to provide just compensation and, citing Hughes

---

[12] As discussed above, it is undisputed that many of the subject containers were located in Okinawa, Japan after this lawsuit was filed.  Textainer, 99 Fed. Cl. at 216.  The government has never argued or presented any evidence to show that plaintiffs' other containers were not similarly being used by the government when they were taken.  As this court found previously, this use clearly satisfies the requirements to demonstrate a taking.

[13] The DTA rate is based on the the one-year Treasury yield rate set by the Federal Reserve ("52-week T-bill" or "Treasuries").

Aircraft Co. v. United States, 86 F.3d 1566, 1574 (Fed. Cir. 1996), to argue that this court should exercise its discretion and apply the Moody's Rate.

The government argues in response that the court should not reconsider its initial ruling and should apply the DTA rate.  According to the government, while the DTA rate is now very low, the reason for the delay in securing compensation rests with plaintiffs.  As a result, the government argues, applying the Moody's Rate would reward plaintiffs for their failure to resolve the ownership issue more quickly.

The court finds, in its discretion, that a combination of both rates is appropriate to use in this case.  For the period from when the lawsuit was filed until 2009, the DTA rate should be applied.  Thereafter, the Moody's Rate should be applied.  The court's primary goal in determining a correct interest rate is to employ an interest calculation that does not simply "yiel[d] a higher or lower payment, but rather . . . is the more accurate measure of the economic harm to property owners."  NRG Co. v. United States, 31 Fed. Cl. 659, 670 n.8 (1994).  In making this determination, the court is to choose an interest rate that puts the property owner in as good a financial position as if the compensation were given concurrently with the taking.  Kirby Forest Indus. v. United States, 467 U.S. 1, 10 (1984).

With these standards in mind, the court is persuaded that in this instance an objective "reasonably prudent investor" would have sought yields consistent with the Moody's Rate.  See Pitcairn v. United States, 547 F.2d 1106, 1124 (Ct. Cl. 1976), ("[L]ong-term corporate bond yields are an indicator of broad trends and relative levels

of investment yields or interest rates.  They cover the broadest segment of the interest rate
spectrum.").

 In addition, the court finds that it is appropriate to compound interest annually.
Compound interest may be necessary "to accomplish complete justice" under the Just
Compensation Clause.  Dynamics Corp. of Am. v. United States, 766 F.2d 518, 519 (Fed.
Cir. 1985) (citations and quotation marks omitted).  Compound interest is also in accord
with prudent investment practices.  Brunswick Corp. v. United States, 36 Fed. Cl. 204,
219 (1996) ("[I]nterest rates shall be compounded annually since no prudent,
commercially reasonable investor would invest at simple interest.").  Thus, plaintiffs are
entitled to interest, compounded annually, based on the DTA rate until 2009 and then to
present based on the Moody's Rate.

## III. CONCLUSION

 For the foregoing reasons, the plaintiffs' motion for summary judgment is
**GRANTED-IN-PART** and **DENIED-IN-PART** and the government's cross-motion for
summary judgment is **GRANTED-IN-PART** and **DENIED-IN-PART**.  The parties
shall file a proposed judgment consistent with this opinion for the court's review no later
than **May 9, 2014**.

 **IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge
